It's number 25-5078. Karen Spencer appellant versus Douglas A. Collins, Secretary, United States Department of Veteran Affairs. Mr Branch for the appellant and Mr Bain for the afternoon. Good morning, Council. Mr Branch, please proceed when you're ready. Good morning. May it please the court. The district court erred in dismissing this case at the pleading stage. The plaintiff elects sufficient facts to support her claims of discrimination based on race and based on retaliation. Once again, this is a pleading stage case. The question is not whether Dr Spencer, um, proved race discrimination or retaliation, but the question is whether her complaint plausibly alleged, uh, alleged discrimination and retaliation. And in fact, the complaint did. The district court demanded proved beyond proof of plausibility and parsed through the complaint and the allegations, uh, in the complaint instead of considering the complaint holistically and stripped away the very context which makes the complaint the claims compelling. So there are two issues here. The first is, um, rule eight did not require Dr Spencer to plea discovery level compared her detail. And in fact, in employment discrimination cases, uh, comparator information is only one way to prove discrimination. But we believe that there was sufficient sufficient facts alleged in the complaint, uh, to demonstrate that the individuals identified were comparators. Uh, Dr Spencer was a nurse practitioner at the V. A. Medical Center, and she alleged that she was discriminated against beginning in 2018. She was suspended previously in place on a force performance evaluation plan, basically a performance plan because there was an incident of her leaving a cap syringe in her office after she administered an injection or trigger point injection. So can you address like why you think that these comparators were appropriate because one comparator was a resident, a doctor, whereas your client is a nurse, and it just seemed very they didn't seem similarly situated. And then there was another group of comparators, nurses who, you know, mishandled syringes. But it seemed that the conduct at issue was different. It wasn't just mishandling a syringe for your client. It was operating outside her scope of, um, whatever scope of procedure or whatever scope of practice. And also, she didn't allege the race of that group of of nurses, which I think is necessary. So why do you think the comparators were were proper? Your Honor, this is the plaintiff was a nurse practitioner. So part of her job was being a nurse, but also she was a practitioner. So she was not a comparator in the sense of comparing herself to another nurse practitioner. But there are certain aspects of her job as a practitioner that were comparable to what this resident did. She diagnosed patients. She saw patients, and she administered treatment to patients, something that a resident would do. So would a brain surgeon be an appropriate comparator to your client nurse practitioner? Your Honor. Well, I'm not sure exactly everything that a brain surgeon brain surgeon would do. But to the extent that part of his job, you just listed. Yeah, well, part of his if part of his job was administering trigger point injections, such as what my client didn't administer trigger point injections. No, the resident diagnosed a patient treated a patient and the patient because of this misdiagnosis, the patient's leg had to be amputated. No, I understand. But but if if the if to be an appropriate comparator, they have to diagnose and treat patients. It seems like any doctor would be in a comparator to a nurse practitioner. That doesn't seem right, Your Honor. I think the argument that I'm trying to communicate is that certain aspects of her job could be compared to other positions that did not have the same title. And then, for example, the nurse part. She was a nurse practitioner. So she said there was actually released in the complaint. And again, this is the judgment where we're proved where we have to prove this. This is a pleading stage where we make the allegations. And then there's evidence that's placed on the record to support the the allegations. And then this is actual under our precedents. And I'm thinking of the joiner case in particular for their other seat. Even even at the pleading stage, there has to be some work done as to the comparator. It's not enough just to plead that there's a comparator. And so then the question becomes, even if it's not the job title of the person, it seems like it's the it's the relevant conduct that gave rise to the sanction. That would be the comparison because it would have to be look. This person did something that's roughly similar, and then they just got treated totally differently. And one is one race and one is the other race. And so you've got the you've got the race and then you've got that they did something similarly and they were treated differently. And the question becomes, is there enough in the complaint from which to draw the conclusion that these are similar? This is a similar type of conduct that occurred. And yet the treatment was different, such that the inference could be that the treatment was different because of the race of the person who was sanctioned in some way. And I think that's where the question arises is, does the complaint give enough for a plausible inference that people who were doing roughly the same thing, same family of stuff, they got treated differently. And it's the same family of stuff that seems like the question here. Yes, Your Honor. And I we obviously we believe that we included enough information in the maybe it's not obvious, but we include we think we included enough information in the complaint. I don't want to offend the court. But so but this is also an issue that is for a fact finder, not at the pleading stage where you plead a complaint. The record needs to be developed. Now, in terms of the it has to be plausible, even at the pleading stage. Yes. But in terms of the nurses, sharpen it up about the type of conduct, the residents conduct, awful consequences of the conduct was breaching standard of care. And that's just a different bucket from a knowing violation of your scope of practice. They're just an inherent medical judgment, violating your scope of practice. That's at least what the VA says. So do you have a specific response to why those that's not the way to think about this? Well, Your Honor, first, the plaintiff was trained in inserting asserting administering trigger point injections. She had done it over a number of years. So she denies that this was beyond the scope of her practice. She was she gets a scope of practice each year. This was included specifically in a number of years. I thought she concedes that performing the injection in her administrative office is outside the scope. Yes, that sort of highlights the difference. It might have been a perfectly safe and appropriate procedure. She did it in the wrong place, which just seems like a different bucket. Then, um, this would be the argument anyway, then they had, uh, making if she had made a mistake while doing this procedure in the right place. But, Your Honor, I yes, she did administered in her office, and she provided an explanation of why it was done in her office. But that still is to be compared to a resident treating misdiagnosing a patient. And the result being that the patient has to have an amputation in terms of the nurses. What we allege in the complaint is that the it was a regular I want to say a regular course, but it happened often that nurses did not handle syringes correctly, and the consequence was typically either some guidance or direction, but it would never result in someone being terminated. And what we alleged in the complaint is for Dr Spencer, she had already been placed on this focus practice performance plan for six months for the last six months of 2018. But then she had the meeting with Dr for Salas in December, and she complained about how long am I going to be on this plan? And the response was, you know, you're a problem child. Nobody likes you here. You're going to be on this plan for a long time. She asserted that he was making these comments because she perceived them as being racist. The result was to place her on another forced performance plan or subject her to an investigation. Three consecutive suspensions starting in January 2019 March May 2019. I just want to give you a chance to one of the difficult one of the government's arguments about the retaliation claims that this looks a lot like breeding where, yes, there was protected activity and then adverse action. But actually, she was already prohibited from practicing before the protected activity occurs. So there's one view of the complaint where it is just proceeding along a predictable path. Can you just want to give you a chance to do your best? Yes. So the best argument there is she was on this performance plan, but that had been completed. And that's why she was going to Dr for Salas to when am I going to be returned to my office? And when are my duties going to resume? And the response was after she complained about discrimination was you're going to be subjected to a new investigation. And we saw as part of the records when they finally reached the decision to terminate her, they considered facts and incidents as far back as 2017. Um, I know that this isn't part of the legal analysis because it's not in the complaint. But the opinion says that your client asked for that investigation and they purposefully assigned three independent people not in her department to perform that investigation. The investigation was triggered after she complained to Dr for Salas. She wanted to return to work, return to her position. And is this? Are you just telling me what's in the complaint? Are you telling me? Are you telling me the L. J. Was wrong? I'm well, it's in the complaint. And I think that I just saying in the complaint, you imply that the second investigation was the result of her making a racial complaint. But there's a finding by the L. J. That she asked for that second investigation because she didn't trust, I guess, Miss Neptune, who was her I don't think. And then the L. J. His opinion says that the cellist got three independent people to conduct that second investigation. I don't think she ever requested a second investigation, particularly for something that had already been resolved. So that takes us to the issue of retaliation. I think we've already kind of wrapped it up and address that as well. Can I ask you? So there's a back and forth in the briefs exhaustion. Yes. And I just want to understand what you understand to be at stake in that dispute, because I think everyone agrees that there are claims relating to the termination, both racial discrimination and retaliation. The district court file. You were also trying to bring a claim that says the investigation itself and the first suspension itself are sort of independently actionable so that you could proceed just on a claim that the investigation was a violation of Title seven. The question I just want to understand what's at stake on appeal. Are you arguing that you should be allowed to proceed on that type of distinct claim? Or do you just want to make sure that you can challenge the termination? It's partly the latter challenged the termination, and she was suspended in May of 2019. I think that issue was accepted. As well. So yeah, May and the termination February and the existence of this investigation as distinct claims in your Sorry, you were gonna answer. But do you want? Are you arguing that those are exhausted claims? We're not making that argument. We're arguing that the claims that the court should consider are the May suspension and the termination in July 2000. Once of the district, etc. Yes. Yeah. Thank you. I'd just like to reserve two minutes. Thank you. The council. Good morning, Your Honor's and may it please the court. I'm assistant U. S. Attorney Andrew Vaden appearing for the secretary. In our view, the issues raised by this appeal are straightforward. Simply put, Spencer's amended complaint simply doesn't plausibly allege that the adverse actions at issue were motivated by racial discrimination or by retaliation. That's true for both of those claims. But I would like if I may to make one overarching point at the outset, you know, reading Spencer's briefs and hearing the presentation from my friend on the other side just now, you might get the impression that this is a dispute over a single mislaid syringe and Dr Spencer's office. That is, I think some of the questioning from the panel elicited while the syringe may have been the beginning of the story, it was not the full extent of the story. You can see that most clearly in paragraph 18 of the complaint, which is, I believe, in the joint appendix of page 30, which explains essentially that, uh, the medical facility director, uh, presented, uh, described the reason for her suspensions as significant concerns regarding Dr Spencer's clinical practice and clinical judgment. So occasionally you might hear, well, you know, this is this is another investigation of the syringe incident. Um, but the important thing here is that this is a set of wide ranging concerns that initiated with the finding of the syringe, but that in fact, uh, the investigation, uh, that that started raised another, a number of other concerns related to patient safety. Can you restate what language you're pointing to? Absolutely. Absolutely. So it's, it's, um, on paragraph 18 of the amended complaint. And let me, if, if you'll forgive me just one moment, um, the, uh, fifth and sixth lines of paragraph 18, Dr Heimel, he might give rise to a different concern. Oh, okay. I meant to ask him. Okay. But a feeble reading to the plaintiff of this entire complaint is that she was only fired because of the ones, isn't it? Oh, I don't, I don't agree with that. The non complaint information suggests that's not true. Well, I don't think you have to go beyond the four corners of the complaint to reach that conclusion. I think that language that I pointed to, uh, in paragraph 18, you know, there are significant concerns regarding clinical practice and clinical judgment. Uh, that's broad. I think there's another way to get to it could be tied just to the one incident, right? I mean, I don't, I don't think that's a natural inference from, from that language in the complaint. I think if there's any doubt there, I think you can also look at the exhibits to the motion to dismiss. These are the suspension letters themselves from January, March and May. Um, that provide a more fulsome description that's, um, starting in the joint appendix, starting at page 109. And it kind of sets out, uh, in more detail the concerns underlying, uh, the facility suspension of Dr Spencer. And the reason that's before the court is explained in our first footnote in the red brief on the statement of the case that basically says these are referred to in the complaint. Um, these are not subject to dispute. Uh, some of these documents attached to the motion to dismiss actually, as we point out in that footnote, uh, our friend on the other side invited the court to consider those same documents in the briefing below. Um, but we don't need to rely on rely on this, right? I mean, even if we assume that it was because of the trickle point injection in the office, there's still the issues with comparators. And I agree with that. Absolutely. Even even if you were to resolve the dispute we're discussing just now and in favor of plaintiff, I think you would still reach the same conclusion. I do think it does sneak into the analysis sometimes, like, for instance, um, Spencer will say, well, this investigation occurred more than 120 days after the incident, and he would then further alleged that this is somehow a departure from established norms or policies. But I mean, one of the approaches in a case like this is to take limited discovery, properly get in the termination letter and move for summary judgment. And you actually the only reason this is in the record is because you filed an alternative motion for summary judgment, which the district court didn't reach. I'm not sure that we can refer, at least for my purposes, it would be more helpful if you argued the case without referring to exhibits for the motion to dismiss. No, that's entirely fair, Your Honor. And that's why I started with paragraph 18 of the complaint. That language there gives you everything you need to understand that this wasn't just, you know, a couple of investigations and three suspensions in the termination related to a single cap syringe. You know, everything you need is in paragraph 18 to understand that the facility here had some wide ranging concerns about Dr Spencer's clinical practice and sense of judgment with patient safety concerns the facility takes very seriously. And that, you know, even within the four corners of the complaint is the agency's proffered rationale for the adverse action. So if we read instead, the complaint favorably to the plaintiff, as saying the only thing she was ever identified as doing wrong is the one incident. Certainly the retaliation claim seems to become stronger. I'm not I'm not sure I agree, because I think ultimately, the retaliation claim has a number of issues that don't relate to the specific rationale proffered by the agency. Your Honor pointed to the the breeding issue, which we think is a is a very significant one. This is ultimately a single chain of this of adverse actions that began before the protected activity and questions. Can you respond to Mr. Branch's argument, which is very much based in paragraph 15 of the complaint, which is essentially, you want to view it as a continuous event. But what the complaint says is, she was put on an FPPE. She was making progress. Then she had this meeting with Dr. Peselas, where she engaged in protected activity, and then things escalated. She had not been formally suspended. She was promptly reinvestigated for something that was four months old. She was suspended three times and then fired. So why, in a motion to dismiss, might have an extremely strong summary judgment motion? Why is that not a plausible reading? Well, I understand. I think the best way to see why our view is plausible is to look at plaintiff's own briefing. So our point... Her version has to be implausible. It doesn't matter if you... Understood. Thank you. The point that I would like to make is to draw on plaintiff's own briefing in this matter. On page three of the reply brief, if I can find, she says, the complaint alleges a single disciplinary progression arising from the same underlying controversy. That's page three of the reply brief. That's not a phrase that we're taking out of context. That's an entire subsection of the reply brief, right? So she's saying this started back in 2018, and then the protected activity occurred, and then the process continued. Her argument is, well, it escalated. And I agree that that's the conclusion she's asking you to draw. But I think here, ultimately, she's pleading conclusion. She's not pleading sufficient factual matter that would make that conclusion plausible. Because every retaliation plaintiff, right, is going to come forward with a protected activity, just about everyone. They're going to come forward with an adverse action. And they're going to invite the court to infer that one caused the other. But here, you have a series of events that started well before the protected activity in question. And as investigations naturally do, they uncover things. And so if you read them in leading braces, next sentence, Dr. Veselas initiated a second fact-finding investigation. It reads as if the allocation is the second investigation wouldn't have started. I understand. I think your honor is correct that she's trying to connect those two in the way that you suggest. In essence, it's a sort of a temporal proximity sort of claim. But I think, as your honor pointed out earlier, well, first of all, I'll mention that this court has held, I think, most recently in Ho versus Garland. Your honor's decision in that case. Yes. You know, the court has pointed out that there's no bright line rules in terms of temporal proximity, right? Each case is decided based on, you know, at the motion to dismiss stage is decided on judicial experience and common sense, trying to weigh whether these particular facts alleged here nudge the claim over the line from conceivable to plausible. And I think just by juxtaposing those two details without more facts doesn't overcome the sort of the breeding point that we make that you see us kind of expand upon at length, you know, starting at page 30 in our in our red brief. So I think for those reasons, we we ultimately think the retaliation claim is not plausible. So what? How do you? How are you conceiving of the timing issue? So the district court had a timing rationale for saying that the retaliation claim doesn't get out of the dismissal stage. That's right. And you're you're not relying on that four square because you're at least accommodating the possibility that there's some allowance as to timing because of the sequence of Well, I think they're both right that we think the district court got it right. So the ultimate question here, right, is protected activity in December 2018. We have an adverse action. Only retaliation claim relates to the July 2019 suspension. So the question is, is there a plausible inference connecting the December 2018 protected activity with the July 2019 termination? Because if nothing happened in between, then just as a matter of timing alone, right? If nothing happened in between, I think you would have decided this case without oral argument, perhaps because it would just be so straightforward materialize. I don't know. That's the point. No, that's right. And no, and I understand and it's it's a real point. And I think, you know, we do our very best to address it on pages, I think, 30 through 32 of the red brief. And I think ultimately, it's the idea. This is something that was already underway. Um, and and, you know, because it was underway, and then an event happened that the second event could not have caused the the initial event, we understand that plaintiff contends, otherwise, we just give it in the in context, you'd ask us to say, there is this close temporal proximity between protected activity, and it seems this investigation, but absent some other indication from the complaint that the VA was ever motivated by her protected activity, weighed with the breeding point, it's just not temporal proximity isn't enough, is that I that's close. I think the one thing I would insist upon is that when we're looking at the analysis, the protected activity is December 2018. Very clear from the briefing. The only retaliation claim before you relates to the July 2019. Uh, um, termination. So those are not very close in the language of the temporal proximity cases. So the question is, can plaintiff come forward with something extra, something that would render the inference plausible? So underlying your argument is that you have to look at each discreet act, and everybody agrees now that she is not exhausted her claim as to the January investigation. It might be a different story if we had, you know, the report of racism in December, and then we were looking at the discreet act of the January investigation. But we're not because it's not exhausted, and the case law suggests there is no ongoing offense anymore. It has to be discreet acts, and we're looking at July and December. That's exactly right. Have we decided a temporal proximity case that's similar to this in that there's protected activity that something happens a month later, but that something is the result of something that started going with is I'm not familiar. I don't have one that comes to mind. I would refer you to the briefs in case I'm overlooking something just off the top of my head. But I I think this is just just what makes it a little bit more complicated. I'm not. No, I definitely was different about this case than your normal retaliation case, potentially, and I don't know that this goes to the pleadings, but just as an abstract matter is that usually in a lot of retaliation cases, somebody files a complaint. And so that's something that an institution is just by definition of here. It's a comment from a comment from one person to another. And so to be a retaliatory act. By nature, someone would have to be acting based on that comment, and so whatever the retaliatory act is would have to be undertaken with awareness of that comment and need to respond to that comment. And that's that's going to you can infer that in a case in which there's a complaint because that's just something that an institution is aware of. If it's a comment to an individual person, then it seems like whatever the retaliatory sequence of events is that gives rise to a claim would have to be something against the backdrop of awareness in the backdrop of awareness of that comment. No, I think that's quite right, Your Honor, and I think that weighs further against the plausibility of the allegations. You know, this is not the sort of a typical complaint where the decision maker would sort of be presumed to be aware of the protected activity. And what would we not though? Would we not presume for a complaint purposes? Would we not presume that? Say if the complaint plausibly alleged it, I don't, you know, because I'm not even sure that there's a conclusion pleaded in the complaint that there was the requisite awareness, but that's not even the question. Of course, the question is whether there's sufficient factual matter that they brought forward. Because the allegation would be that Fussell has told Highball. Right. If they allegedly alleged that, that would do it, yes. It runs into the issue that there's no possible way she could know about that without discovery. Well, I mean, that allegation, you know, would be difficult to make. But obviously plaintiffs are painting on a blank canvas. They can plausibly allege, you know, their claim. People may not know about comparators too. And that just means that the claim can't go forward even if it might. I just had one last question to clarify a response to an earlier question. It seems to be common ground now that the investigation is not actionable. Under Morgan, are you, are you disputing that under Morgan, we can still look to those facts as background facts for the exhausted claim. So maybe they're, we've been discussing how relevant and probative these intermediate facts are, but surely we can look at the facts in support of the actionable termination claim, right? I do think, you know, those are facts that she alleges that are fair game for inferences. We obviously have a disagreement with our friend on the other side about whether that's sufficient. Make sure my colleagues don't have additional questions. Thank you very much. DeBranch will give you the two minutes you asked for. And just without repeating myself just once again, this is we're at the the pleading stage of this complaint in the court. The panel has asked a number of questions that should be part of the record, but that would come forward from summary judgment and from discovery. There were facts alleged in the complaint specifically as it relates to Dr. Fussell is that exact in this meeting in December, 2018, that Dr. Fussell has said in response to Dr. Spencer, I'm going to initiate this investigation, you know, a second investigation. So that goes to the first part of the retaliatory acts that concluded with the termination in July. But it begins with Dr. Fussell is initiating a second investigation and then three additional suspensions in terms of the retaliation claim. The issue is, even though she only preserved the May 2019 suspension and the termination, the fact that she the investigation was initiated and she suspended on three occasions, January, March and then May, that again would weigh in favor of a plausible claim for retaliation. Certainly, if you raise a claim, an issue, you're taking this action for discriminatory reasons against me. And the response is an investigation as well as three suspensions. I apologize to interrupt, but I want to ask you about what I think is a crucially important fact. Sure. Does this complaint allege that she was fired just for the 2018 incident, a single incident? That's that was the intention of the complaint. Yes, that she is. She's alleging that she was terminated because of this trigger point injection incident. So, yes, but she also alleged this complaint. You have the termination, right? We we have the termination letter and she disputes the other reasons given in the termination letter, but she believes that she was terminated because of this trigger point incident. This isn't in your complaint, but the ALJ found that the termination decision was made by this council of doctors, nine doctors, the MEC, and there's no. Allocation or suggestion that they knew about. The report of racism by your client. Well, I think the termination decision was made by Mr.  Well, according to the ALJ, there was a whole committee that convened and reviewed the whole case and made a recommendation, and there were nine different doctors. Yeah, but there's no indication they knew about. It's hard to be retaliatory if they didn't know about the complaint, as the chief judge mentioned. Well, Heimel Heimel issued a letter that says there were nine or 10 allegations or specifications and five or six were sustained, but Heimel made the final decision. And how do I and why do we glean from the complaint that Heimel knew about the interaction between. Spencer and Dr. Faciles. Dr. Faciles initiated the investigation. It would have to be approved by Heimel. Heimel would have to be involved. I think he actually approved the three suspensions. Right. But how why don't we think that he would have known about the comment made by Faciles to Spencer? That is. I'd have to actually take another look at the complaint to see if we specifically allege that she made some complaint to Heimel concerning Dr. Faciles. I'm inclined to say she probably did because she complained to everyone about the treatment that she received before her termination. Make sure my colleagues don't have additional questions for you. All right. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Pan; Garcia